# APPEAL NO. 25-5053

## UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

| | |
|---|---|
| **ERIC F. SCHOLL and JACQUELINE R. SCHOLL,** individually and as parents and next friends to J.J.S., a minor child; J.J.S. a minor child, | |
| **Appellants / Petitioners** | **On appeal from the United States District Court for the Northern District of Oklahoma** |
| v. | |
| **WALGREENS SPECIALTY PHARMACY, LLC d/b/a ALLIANCERX WALGREENS PRIME, a foreign drug company, and WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC, a foreign company** | **(D.C. No. 4:21-cv-363-JDR-MTS)**  **The Honorable John D. Russell** |
| **Appellee / Respondent** | |

## APPELLANTS' OPENING BRIEF

Andrew C. Jayne, OBA #19493
Jason A. McVicker, OBA #31150
Bryan J. Seaton, OBA #36248
JAYNE PETERS MCVICKER BURKE ASKEW & PARKER
401 S. Boston, Suite 2000
Tulsa, OK 74103
 (t) (918) 938-7944; (f) (918) 938-7966
ajayne@jpmlawgourp.com
jmcvicker@ jpmlawgourp.com
bseaton@ jpmlawgourp.com
*ATTORNEYS APPELLANTS/PETITIONERS*

## ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

PRIOR OR RELATED APPEALS ...............................................................v

STATEMENT OF JURISDICTION ...........................................................v

STATEMENT OF THE ISSUES ...............................................................vi

INTRODUCTION...........................................................................................1

STATEMENT OF THE CASE AND THE FACTS...................................3

    I.  J.J.S.'s Medical History ...............................................................3

    II.  The Lupron Depot Prescription and AllianceRx's Negligence...................4

    III.  Procedural History, Initiation of Suit, and Removal to Federal Court .....9

    IV.  Walgreens's Motion for Summary Judgment and the Court's Ruling .....9

SUMMARY OF ARGUMENT ..................................................................11

ARGUMENT AND AUTHORITIES

    I.  Standard of Review....................................................................12

    II.  The District Court's *sua sponte* summary judgment should be reversed because it prejudiced the Scholl family. .......................................13

    III.  The District Court erred by finding that Walgreens did not assume a duty through affirmative conduct, and erred by deciding genuine disputes of material fact that should have been resolved by a jury.................................15

    IV.  The District Court erred in holding that pharmacists need not fill valid prescriptions in emergency circumstances. .................................................19

        A.  As a threshold matter, the District Court erred by ignoring Walgreens's judicial admissions. ....................................................19

        B.  The District Court erred by ignoring Oklahoma common law.....20

        C.  The District Court erred in interpreting the Pharmacy Act and related regulations. ..........................................................................22

**CONCLUSION** ...............................................................................**27**

**CERTIFICATE OF COMPLIANCE** ..................................................**28**

**STATEMENT OF COUNSEL AS TO ORAL ARGUMENT**.............................**29**

**CERTIFICATE OF SERVICE** ............................................................**30**

**ATTACHMENT A: Memorandum and Order**

**ATTACHMENT B: Judgment**

# TABLE OF AUTHORITIES

## CASES

*Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998)...........................12, 13

*Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201 (10th Cir. 2017)...................20

*Avodah Farms v. O'Hara-Ruskowski*, No. 24-CV-00233-NYW-CYC, 2025 WL 16746509 (D. Colo. June 13, 2025)..............................................................................20

*Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114 (10th Cir. 2005)...................................13

*Carista v. Valuck*, 394 P.3d 253 (Okla. Civ. App. 2016) .....................................21, 22

*Cherokee Nation v. McKesson Corp.*, No. CIV-18-056-RAW, 2021 WL 1200093 (E.D. Okla. Mar. 29, 2021).............................................................................................21

*Harwood v. Argdagh Grp.*, 522 P.3d 473 (Okla. 2022) ................................ 16, 17, 18

*Hodara v. Oklahoma Dep't of Corr.*, 2025 WL 1748587, __P.3d__ (Okla. 2025) ...24

*Jackson v. Oklahoma Memorial Hospital*, 909 P.2d 765 (Okla. 1995) ....................27

*Kovaly v. Wal-Mart Stores Texas, L.L.C.*, 627 F. App'x 288 (5th Cir. 2015).............22

*Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141 (10th Cir. 1988) ...............13

*Pharmacare Oklahoma, Inc. v. State Health Care Auth.*, 152 P.3d 267 (Okla. Civ. App. 2007) .................................................................................................................19

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994) ................................................25

*Runyon v. Reid*, 510 P.2d 943 (Okla. 1973)................................................................21

*Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474 (10th Cir. 2023)....................13

*Sparks v. Hicks*, 912 P.2d 331 (Okla. 1996) ..............................................................26

*Wofford v. E. State Hosp.*, 795 P.2d 516 (Okla. 1990).........................................20, 21

**STATUTES**

Okla. Stat. tit. 59, § 353.20.1(B) .......................................................23

Okla. Stat. tit. 59, § 353.20.2(A) .......................................................23

Okla. Stat. tit. 59, § 353.20.2(C) ..................................................23, 27

Okla. Admin. Code § 535:10-3-1.1......................................................23

Okla. Admin. Code § 535:10-3-1.1(6) .................................................26

Okla. Admin. Code § 535:10-3-1.2(11) ..........................................23, 26

Okla. Admin. Code § 535:10-9-2..........................................................23

Okla. Admin. Code § 535:15-3-2 .........................................................23

Okla. Admin. Code § 535:15-3-13(c) ........................................ 24, 25, 27

**RULES**

Fed. R. App. P. 56 ...............................................................................17

Fed. R. App. P. 56 (c)............................................................. 12, 13, 20

**RESTATEMENTS**

Restatement (Second) of Torts § 323 ....................................................16

## PRIOR OR RELATED APPEALS

None.

## STATEMENT OF JURISDICTION

The District Court properly exercised diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. Diversity jurisdiction exists as all parties are from different States and the amount in controversy exceeds $75,000. The District Court issued an Opinion and Order, attachment A, and entered a summary judgment against the Plaintiffs on all claims on March 28, 2025, attachment B. Plaintiffs filed a Notice of Appeal on April 21, 2025. This is an appeal from a final order that disposes of all the parties' claims. The Notice of Appeal was timely pursuant to Fed. R. App. P. 4 (a)(1)(A). This Court's appellate jurisdiction derives from 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Did the District Court err by finding that no duty had been assumed under Oklahoma law, where a pharmacy did in fact fill a prescription in an untimely fashion, after telling its patient's family that it would do so and taking affirmative steps to do so?

2. Did the District Court err by *sua sponte* raising a number of arguments that the movant did not assert without giving the plaintiffs notice and an opportunity to be heard?

3. Did the District Court err by finding that Oklahoma common-law does not apply to pharmacists?

4. Did the District Court err in interpreting Oklahoma statutory and regulatory law in concluding that a pharmacy owes no duty to patients timely dispense a valid prescription when it has voluntarily undertaken the process of filling that prescription?

5. Did the district court improperly resolve disputed questions of material fact regarding the formation of a pharmacist-patient relationship and whether the pharmacy voluntarily undertook responsibilities with respect to the plaintiff's care?

Eric and Jacqueline Scholl, the Appellants, proudly adopted their daughter J.J.S. from China in 2012. Since then, they have provided around-the-clock care for her complex medical conditions, which require consistent access to time-sensitive specialized medications. This appeal arises from the Appellees'—Walgreens Specialty Pharmacy, LLC d/b/a AllianceRx Walgreens Prime, and Walgreens Specialty Pharmacy Holdings, LLC (collectively "Walgreens")—delayed delivery of those critical pharmacy services at time it was needed most.

J.J.S.'s physician submitted what should have been a routine request for a specialty medication essential to the child's care. Walgreens failed to fill the prescription in a timely fashion, and when questioned, failed to explain why. In fact, after lying to the Scholl family that the prescription would be filled, Walgreens secretly decided to abandon the patient under an undisclosed internal policy they later described as a "No Go" designation. Rather than counsel the family, provide alternatives, or refer the prescription out, Walgreens allowed the prescription to languish unfilled, un-transferred, and unexplained until it was too late. Walgreens filled the prescription only after J.J.S. was repeatedly hospitalized.

Aware that something had gone wrong during this process, the Scholls made multiple documented calls to Walgreens to investigate and remedy the situation. Despite these efforts, Walgreens misled the family, concealing the secret patient-abandonment process and the fact that it had been implemented against them. This

concealment, coupled with Walgreens's failure to communicate critical information, deprived the Scholls of any opportunity to secure the urgently needed medication elsewhere in time.

As a direct result of Walgreens's negligence, the child experienced a serious and preventable medical crisis, requiring multiple emergency interventions and subjecting J.J.S. to unnecessary agony, psychological trauma, and destabilization. For the Scholls, the consequences included emotional anguish, the distress of watching their child suffer, and the large financial costs associated with the emergency care that could have been avoided had Walgreens simply met their basic professional duties as a pharmacy.

The Scholls filed a negligence action, alleging that Walgreens breached common law duties, including the duty to exercise ordinary care, the duty not to abandon a patient without adequate notice, and the duty to communicate material information affecting ongoing treatment. Walgreens moved for summary judgment, arguing that there was no time limit for filling prescriptions. The District Court ignored Walgreens's arguments and drafted its own arguments *sua sponte*, concluding that Oklahoma law imposes virtually no duties on pharmacists, a decision admittedly without precedent.

This Court should reverse the entry of summary judgment. The District Court erred in its legal conclusions, and improperly resolved genuine disputes of material

fact. Oklahoma does not allow professionals to abandon their clients without legal recourse, and the District Court erred by ruling that pharmacy conglomerates can immiserate children without consequence.

## STATEMENT OF THE CASE AND THE FACTS

### I.    J.J.S.'s Medical History

After a lengthy adoption process, Jacqueline and Eric Scholl welcomed their daughter, J.J.S., to Tulsa at age five. J.J.S. was completely deaf. Ms. Scholl eventually secured a custom cochlear implant algorithm, giving J.J.S. the ability to hear. Still, years without hearing caused significant speech delays. She mainly communicates through Signed Exact English and American Sign Language.[1]

In May 2020, when J.J.S. was twelve, she developed unbearable abdominal pain. On May 19, Ms. Scholl took her to a hospital, where imaging revealed vaginal agenesis, a rare congenital condition. Dr. Katherine Hildebrand confirmed that J.J.S. lacked a functional vaginal opening, causing her body to retain menstrual material.

Dr. Hildebrand explained three options: (1) a hysterectomy (ending J.J.S.'s ability to bear children); (2) reconstructive surgery followed by a painful dilation regimen (likely intolerable for a child); or (3) Lupron Depot hormone therapy to suppress ovulation and delay surgery until J.J.S. could make an informed decision.[2]

---

[1] Petition, ¶1, ¶¶ 7-11, App. Vol. 1 at 12.
[2] May 29, 2020, Op. Report of Dr. Hildebrand, p. OBGYNST per SDT 0199, App. Vol. 1 at 89; Dep. of Dr. Hildebrand, 21:21-24:5; 42:19-43:16, App. Vol. 4 at 32, 37.

3

Dr. Hildebrand recommended the third option. The Scholls agreed, and J.J.S. was to begin Lupron injections every three months to prevent recurrence of pain.

## II.    The Lupron Depot Prescription and AllianceRx's Negligence

At all relevant times, the Scholl family was insured through Blue Cross Blue Shield of Oklahoma ("BCBSOK").[3] When J.J.S. was to begin her required treatment, Ms. Scholl contacted BCBSOK to ask where the prescription could be filled. BCBSOK informed her that AllianceRx was the only specialty pharmacy in-network authorized to fill the prescription.[4]

AllianceRx, a Walgreens-affiliated specialty pharmacy, operates in a compartmentalized structure. Its operations are divided across four departments: (1) Patient Care Coordinators, who speak with patients; (2) an Insurance Verification Department, which communicates with insurers; (3) a Pharmacy Department, which confirms and fills prescriptions; and (4) a Shipping Department, which handles delivery logistics.[5] Despite its size and scope, AllianceRx does not allow patients or physicians to communicate directly with specific personnel. Instead, all contact is routed through a centralized 1-800 number, regardless of the urgency or complexity of the issue.[6]

---

[3] Dep. of Jacqueline Scholl, 75:13-16, App. Vol. 3 at 123.

[4] *Id.* at 121:8-24, App. Vol. 3 at 134.

[5] Dep. of Catherine Cirrincione, Corporate Designee, 53:13–20, App. Vol. 3 at 72; Dep. of Darlene Rojas, 22:10–19, App. Vol. 3 at 160.

[6] Dep. of Mykelia Carrington, 34:8–35:5, App. Vol. 3 at 40.

AllianceRx tells the public (and told the Scholl family) that it coordinates with insurers and providers to ensure timely delivery without patient participation, even going so far as to tell patients "there's no need for you to do anything" with prior authorizations.[7] But Walgreens does not warn the public about its "No Go" policy. Under this policy, AllianceRx will secretly abandon patients if three internal attempts to verify insurance information or obtain prior authorization are unsuccessful, without notifying either the patient or the prescribing provider.[8] Notably, neither patients nor providers are informed that AllianceRx follows this "three strikes" type of rule.[9] Plaintiffs' expert, Jack Raber, Pharm. D, opined that the failure to disclose such a policy fell below the standard of care for specialty pharmacies.[10]

On June 1, 2020, Dr. Hildebrand's office submitted the Lupron Depot prescription through Abbvie, the drug manufacturer.[11] The request reached AllianceRx on June 2, 2020. At that time, AllianceRx's *internal* notes reflected that confirmation from the provider would be needed before proceeding.[12]

---

[7]  Doc. 46-9, AllianceRx Website, App. Vol. 4 at 41.
[8] Doc. 41-6 at WALGREENS00043, AllianceRx Priority Chart, App. Vol. 1 at 169; Dep. of Catherine Cirrincione, 101:24–102:13, App. Vol. 3 at 84; Dep. of Mykelia Carrington, 81:14–15, App. Vol. 3 at 51.
[9] Dep. of Catherine Cirrincione, Corporate Designee, 105:2–13, App. Vol. 3 at 85.
[10] Raber Report, ¶ 29, p. 7, App. Vol. 4 at 50.
[11] Doc 41-4, Lupron Depot Referral Form, App. Vol. 1 at 103.
[12] Doc. 41-9 at WALGREENS00002, Consolidated Patient Notes, App. Vol. 1 at 180.

That confirmation was successfully obtained on June 3, 2020, when AllianceRx contacted Dr. Hildebrand's office.[13] However, AllianceRx only verified medical need, and made no mention of a need for prior authorization during that call; a critical omission given the time-sensitive nature of the treatment.[14]

AllianceRx ignored the prescription for nine days. On June 11, 2020, AllianceRx finally sent a fax sent to Dr. Hildebrand's office requesting assistance with obtaining prior authorization.[15] According to Mr. Raber, this delay, especially in light of the June 3 call, constituted a breach of the applicable standard of care. Raber explained that best practices required AllianceRx to raise the authorization issue during the June 3 call, and that the prolonged delay in acting could foreseeably result in delayed treatment.[16] AllianceRx considered the June 11 fax as the first 'strike' under the "No Go" policy.[17] Once received, Dr. Hildebrand's office administrator, Kristen Cornwell, promptly began working to secure the required authorization from BCBSOK.[18]

---

[13] *Id.* at WALGREENS0012, Consolidated Patient Notes, App. Vol. 1 at 190.
[14] *Id.*; Dep. of Kristen Cornwell, 52:11-53:5, App. Vol. 1 at 203-04.
[15] Doc. 41-9 at WALGREENS00002, Consolidated Patient Notes, App. Vol. 1 at 180.
[16] Raber Report, ¶¶ 12–14, 29, p. 3-4, 6, App. Vol. 4 at 46-47, 50.
[17] Doc. 41-6 at WALGREENS00043, AllianceRx Priority Chart, App. Vol. 1 at 169; Doc. 41-9 at WALGREENS00002, Consolidated Patient Notes, App. Vol. 1 at 180.
[18] Dep. of Kristen Cornwell, 21:3–14, App. Vol. 4 at 11.

Four days later on June 15, 2020, AllianceRx issued its second 'strike' when a representative contacted the physician's office again.[19] That same day, Ms. Cornwell returned AllianceRx's call. *Id.* Ms. Scholl also called AllianceRx, speaking with multiple representatives for more than 43 minutes to resolve the issue.[20]

During these June 15 calls, Ms. Scholl reached Patient Care Coordinator Tiffany Carrington. Ms. Scholl explained the urgency of the situation, and asked whether she could bypass the insurance delays by paying for the medication out-of-pocket and picking it up in person.[21]

Carrington refused, telling Ms. Scholl that out-of-pocket payments were forbidden; she would later testify that she would not have allowed such a transaction under any circumstances.[22] But AllianceRx's corporate representative testified that self-pay *was* permissible under company policy, and would have bypassed a need for a preauthorization.[23] Mr. Raber opined that refusing Ms. Scholl's payment offer fell below the standard of care.[24]

The following day, June 16, 2020, 10:48 a.m., AllianceRx made a third call to Dr. Hildebrand's office and spoke with Cornwell, who confirmed that the pre-auth

---

[19] Doc. 41-9 at WALGREENS00003, Consolidated Patient Notes, App. Vol. 1 at 181.
[20] Scholl Phone Records at WALGREENS006078, App. Vol. 4 at 25.
[21] Dep. of Jacqueline Scholl, 78:13–79:18, App. Vol. 3 at 124.
[22] Dep. of Mykelia Carrington, 45:19–46:2, App. Vol. 3 at 42-43.
[23] Dep. of Catherine Cirrincione, Corporate Designee, 34:16–20, 86:7–16, App. Vol. 3 at 67, 80.
[24] Raber Report, ¶ 29, pp. 8–9, App. Vol. 4 at 51-52.

was forthcoming. Just *two minutes* after hanging up, at 10:50 a.m., AllianceRx recorded that as the third 'strike' and the prescription entered "No Go" status.[25] At 10:51 a.m., Carrington left Ms. Scholl a voicemail indicating the authorization had not been obtained and instructing her to contact the doctor's office.[26] Critically, AllianceRx's own *internal* notes confirmed that Ms. Scholl had previously advised them not to leave voicemails, as her phone could not receive them.[27]

Later that same day, roughly two (2) hours later at 12:53 p.m., Cornwell successfully obtained the prior authorization from BCBSOK.[28] Both Cornwell and Ms. Scholl the provided it to the pharmacy.[29] By that time, AllianceRx had already abandoned the patient, despite the fact that the treatment window was still open and the insurance requirements had been satisfied.

The direct consequence of AllianceRx's abandonment was agonizing pain for a disabled child, and several hospitalizations. Six days after the final hospitalization, AllianceRx finally delivered the shot.[30]

---

[25] Doc. 41-9 at WALGREENS00003, App. Vol. 1 at 181.
[26] *Id.*
[27] *Id.* at WALGREENS00002, App. Vol. 1 at 180; Dep. of Mykelia Carrington, 70:10–71:22, App. Vol. 3 at 49.
[28] Doc. 41-17, J.J.S.'s Insurance Coverage Summary, App. Vol. 2 at 18-22; Doc. 41-18, Telephone Transcript, February 1, 2022 Conversation Rachel Gray Hawk (BCBS) and Kristen Cornwell, App. Vol. 2 at 23-25.
[29] Dep. of Kristen Cornwell, 26:4-23, App. Vol. 4 at 12; Dep. Of Ms. Scholl, 176:7-15, App. Vol. 3 at 148.
[30] Doc. 41-26 at WALGREENS 00046, App. Vol. 2 at 62.

### III.    Procedural History, Initiation of Suit, and Removal to Federal Court

On July 30, 2021, Plaintiffs Eric and Jacqueline Scholl, on behalf of their minor child, J.J.S., filed their Petition in Tulsa County District Court asserting a single claim of negligence against Walgreens.[31] The Scholls alleged that Walgreens failed to timely deliver a critical dose of Lupron Depot to J.J.S.'s physician, Dr. Hildebrand. This failure caused J.J.S. to undergo unnecessary invasive surgery, incur unnecessary additional medical expenses, and suffer avoidable and prolonged pain.[32] Walgreens removed the case to the United States District Court for the Northern District of Oklahoma on September 3, 2021.

### IV.    Walgreens's Motion for Summary Judgment and the Court's Ruling

After discovery, Walgreens moved for summary judgment.[33] Walgreens admitted that it failed to deliver the medication as promised, and repeatedly admitted that it owed a duty to fill prescriptions.[34] Defendants never argued that Walgreens owed no duty to fill J.J.S.'s prescription. Instead, Walgreens argued that it discharged its duty at 12:52 p.m. on June 16, 2020, when Walgreens closed its file, and that a new duty was assumed after July 13, 2020.[35]

---

[31] Petition, ¶¶ 30-35, pp. 6-7, App. Vol. 1 at 17-18.
[32] Petition, ¶ 34, p. 6, App. Vol. 1 at 17.
[33] Walgreen's Motion for Summary Judgment, App. Vol. 1 at 54.
[34] Walgreen's Motion for Summary Judgment at 14-15, App. Vol. 1 at 70-71.
[35] Walgreen's Motion for Summary Judgment at 16-19, Appellants App. Vol. 1 at 72-75.

Walgreens' motion confined their argument to a specific window of time —
from the afternoon of June 16 until the prescription was finally filled. At no point
did Walgreens argue it owed no duty prior to June 16, 2020, and it certainly did not
claim that pharmacies generally owe no duty to patients. The closest Walgreens came
was to argue that "a pharmacy have a duty to fill a prescription free of charge"[36] – a
non-sequitur here, where there was no expectation of a free prescription and indeed,
the Scholls begged Walgreens to let them pay. The Scholls opposed the motion,
noting the many disputed facts and this Court's holding that mere compliance with
internal policies and procedures do not immunize a defendant from negligence.[37]

On March 28, 2025, the District Court entered judgment in Walgreens's favor,
based on an argument Walgreens did not make. Indeed, although Walgreens admitted
in its Motion for Summary Judgment that it owed a duty to J.J.S.,[38] the District Court
*sua sponte* declared that no such duty existed.[39] Stepping into the role of advocate,
the District Court engaged in extensive argument on behalf of Walgreens. The
District Court even included a lengthy section of legislative findings, declaring as a
matter of public policy that pharmacists should have no responsibilities.[40]

-------------------

[36] Walgreen's Motion for Summary Judgment at 15, Appellant's App. Vol. 1 at 71.
[37] Response to Walgreens Motion for Summary Judgment, App. Vol. 3 at 3.
[38] Walgreen's Motion for Summary Judgment at 14-15, App. Vol. 1 at 70-71.
[39] Opinion and Order, App. Vol. 5 at 3, attached as Attachment A; Judgment, App.
Vol. 3 at 23, attached as Attachment B.
[40] Walgreen's Motion for Summary Judgment at 18-20, App. Vol. 1 at 74-76.

## SUMMARY OF ARGUMENT

The District Court erred by finding that Walgreens did not assume a duty under these facts. Walgreens did not merely say it would fill the prescription once it received the preauthorization number – it actively took steps to obtain the preauthorization number. Oklahoma law recognizes that this constitutes an assumption of a duty. Moreover, to find that no duty was assumed is to ignore the fact that Walgreens did eventually fill the prescription (but did so too late to prevent harm to J.J.S.). Under the District Court's reasoning, filling the prescription was some gratuitous and unexplained act that Walgreens did for no reason – an absurd conclusion. Walgreens undertook to fill a prescription and did so poorly; its tardiness caused significant patient harm, and Walgreens should thus be liable in negligence.

Separately, the District Court improperly substituted its own reasoning and factual assumptions for the limited arguments raised by the Defendants. Although Walgreens admitted to the existence of the duty upon which J.J.S.'s claims were premised, the District Court *sua sponte* drafted (and granted) its own motion for summary judgment that contradicts Walgreens' admissions. It was error to deprive the Scholl family of notice and an opportunity to respond to the arguments raised solely by the Court on behalf of Walgreens.

The District Court created a sweeping rule that no duty exists to fill a valid prescription – an argument so bold that Walgreens did not make it, and a conclusion

so bold that the District Court felt the need to include legislative justifications in its Opinion. The District Court erred by holding that pharmacists have no legal duty to fill valid prescriptions under Oklahoma law.

The District Court's conclusion misinterprets statutory and regulatory framework, elevates discretionary language over established standards of care, and ignores the foreseeability-based duties recognized in Oklahoma tort law. Pharmacists are obligated to act reasonably in dispensing medication, particularly where patient harm is foreseeable. This Court should reverse the District Court's grant of summary judgment and remand this case for a jury trial.

## ARGUMENTS AND AUTHORITIES

### I.    Standard of Review

This Court reviews a district court's grant of summary judgment de novo, applying the same standard as the district court under Federal Rule of Civil Procedure 56(c). *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* 56(c); *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir. 1988).

In determining whether a genuine issue of material fact exists, the evidence and all reasonable inferences must be viewed in the light most favorable to the Scholls. *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005). A fact is "material" if, under the applicable substantive law, it "is essential to the proper disposition of the claim." *Adler*, 144 F.3d at 670. Legal conclusions reached by the district court are not entitled to deference and are reviewed de novo. Where the district court's ruling rests on a misapplication of substantive law or improperly resolves factual disputes that should be left to the jury, reversal is warranted.

## II.    The District Court's *sua sponte* summary judgment should be reversed because it prejudiced the Scholl family.

*Sua sponte* summary judgments should be reversed if the losing party was not given notice and an opportunity to present contrary evidence. *Safeway Stores 46 Inc. v. WY Plaza LC*, 65 F.4th 474, 481 (10th Cir.). Here, the District Court engaged in extensive motion practice on behalf of Walgreens, raising a host of arguments that Walgreens did not assert, and making evidentiary assumptions in the light most favorable to Walgreens.

Walgreens admitted that it owed a duty to fill prescriptions, and never denied that it owed a duty to J.J.S. Instead, it argued that it had adequately performed its duties. The District Court's Opinion utterly ignores the arguments that Walgreens actually did make, instead deciding, that Oklahoma's common law does not apply to pharmacists; that the Pharmacy Act does not require pharmacists to dispense drugs

13

under any circumstances (including even under emergency circumstances); that rules enacted after J.J.S. was injured retroactively destroy any duty owed to her; that there was never a "meeting of the minds" between Walgreens and the Scholl family (even though Walgreens did in fact fill the prescription); and that pharmacies may abandon patients with no notice even after telling those patients that they will fill prescriptions.

By denying the Scholl family of notice or opportunity to respond to these issues, the District Court prejudiced them. The Scholls relied on Walgreens's judicial admissions, and should not be penalized for doing so.

Moreover, particularly with regard to the "meeting of the minds" issue, the Scholls were not informed that it would be necessary to prevent testimony or evidence regarding the circumstances of Walgreens's agreement to fill the prescription. This is especially important here, given that the District Court ignored the fact that *Walgreens eventually did fill the prescription.* The crux of this lawsuit was Walgreens's excuse for its tardiness. Given that Walgreens admitted it owed a duty and did eventually provide the requested medication, the Scholls did not have notice that they would need to provide evidence of the circumstances of the formation of the pharmacist/patient relationship.

Where a plaintiff has no notice that summary judgment may be granted on grounds not raised by the defendant, they should be given an opportunity to provide

arguments, briefing, and evidence on those surprise grounds. The District Court erred by failing to provide that opportunity here, and the entry of summary judgment should be reversed.

### III. The District Court erred by finding that Walgreens did not assume a duty through affirmative conduct, and erred by deciding genuine disputes of material fact that should have been resolved by a jury.

The District Court attacked J.J.S.'s physician, arguing without evidence or authority that "[t]he duty to obtain payment authorization from an insurer and to communicate that authorization to the pharmacy... should fall on the prescribing physician..."[41] Similarly, the District Court argued that a pharmacy "has no duty to chase down information to provide medication..."[42] But the District Court failed to acknowledge the evidence or testimony that Walgreens tells patients in general, and the Scholl family in particular, that *Walgreens* would undertake these tasks.[43]

Perhaps equally as important, Walgreens did in fact provide the prescription (albeit too late to prevent harm to J.J.S.). If the District Court's theory was correct, then Walgreens's late filling of the prescription was inexplicable and gratuitous. If the pharmacy truly had no duty to fill the prescription, it would not have done so. Walgreens's own actions establish that a duty did arise. and that its conduct must be judged under the applicable standard of care.

---

[41] Opinion and Order, p. 18, App. Vol. 5 at 20.
[42] Opinion and Order, p. 19, App. Vol. 5 at 21.
[43] Walgreens Website, App. Vol. 4 at 41-42.

In Oklahoma, a party may assume a duty through voluntary action. In *Harwood v. Ardagh Grp.*, 522 P.3d 473, 480–82 (Okla. 2022), the plaintiff sued for negligence, alleging that an employer owed a duty to provide a safer crosswalk for employees in the employer-designated parking lot. The trial court dismissed the case, reasoning that the employer owed no such duty. But the Oklahoma Supreme Court reversed the dismissal, noting that a duty may be assumed through voluntary action. Whether or not a duty existed before, the Oklahoma Supreme Court applied the Restatement (Second) of Torts § 323 to determine that since the employer had taken affirmative steps to make the crosswalk safer, the employer may have assumed a duty to make the crosswalk safer. *Id.*

Here, the record demonstrates that Walgreens assumed a duty to fill the prescription, because it did in fact fill the prescription (a fact the District Court ignored), and through its actions in both promising to seek out and *actually* seeking out authorization. Whether or not a duty existed in an abstract sense, once Walgreens promised to seek this information, took affirmative steps to seek the information, and eventually did fill the prescription, it clearly assumed a duty under *Harwood*.

The District Court concluded that Walgreens had no further obligation once it said it could not fill the prescription. But this conclusion improperly resolves material factual disputes in Walgreens's favor and misapprehends the shared responsibility that governs pharmacy practice. Again, Walgreens argued that it

16

discharged its duty at 12:52 p.m. on June 16, 2020, when Walgreens closed its file. But the parties submitted extensive and disputed evidence about the nuances of the communications and actions of the parties and the insurer from the time the prescription was submitted, all the way through the time it was finally filled (too late).

The District Court's Opinion explicitly wades into these facts, ignoring contrary evidence about what was said and when to credulously accept *only* Walgreens's claims about the *what* and the *when*.[44] This type of fact-finding should be performed by a jury, not a court under Fed. R. Civ. P. 56. And while Walgreens contends that pharmacists should be allowed to injure (and apparently even kill) their patients without consequence, there was extensive, disputed testimony about how a reasonably pharmacist would satisfy the standard of care.[45]

Walgreens was not some passive bystander uninvolved in this process. It received a time-sensitive prescription, was told it required preauthorization, and received that authorization. Yet it failed to timely act due to an undisclosed personal rule. Its own employee acknowledged it could and sometimes did act on faxed or verbal approvals, but here, the file was secretly "closed." A jury is entitled to evaluate whether Walgreens's conduct met the applicable standard of care under

---

[44] Opinion and Order, p. 2, 5; Appellant's App. Vol. at 4, 7.
[45] *E.g.,* Raber Report at ¶ 29, p. 6; Appellant's App. Vol. 4 at 49.

those facts. The District Court, in a single line unadorned with any reasoning, authority, or reference to the record, declared that "there is no evidence or suggestion that Plaintiffs' injuries were caused by Walgreens's conduct after July 13, 2020." But that statement does not address whether the delayed administration of the medication caused harm. The injury occurred *before* the medication was administered—not after. The causation question is whether the delay in filling the prescription caused harm. The expert testimony, deposition evidence, and Walgreens's own records support that it did.

The District Court's reasoning does not merely contradict *Harwood*. The District Court followed the *Harwood* dissenters and their argument about what they wished Oklahoma law to be. But the dissenters did not prevail in *Harwood*, and it is axiomatic that the majority opinion is the true statement of Oklahoma law. Given that the District Court was duty-bound to follow Oklahoma law as set forth by the Oklahoma Supreme Court, this Court should reverse the entry of summary judgment.

The evidence shows that Walgreens undertook a duty, and ultimately did provide the prescription (but did so too late). Whether Walgreens met the standard of care after it clearly assumed a duty through its actions presents a classic fact question for a jury. This Court should reverse the judgment, and remand this case for trial.

18

**IV.   The District Court erred in holding that pharmacists need not fill valid prescriptions in emergency circumstances.**

**A.      As a threshold matter, the District Court erred by ignoring Walgreens's judicial admissions.**

At the outset of Walgreens's Motion for Summary Judgment, it admitted that it owed a duty to J.J.S.[46] Walgreens argued only that its performance *satisfied* that duty, and that once its duty was discharged it did not then assume any other duty.

As Walgreens put it, "In Oklahoma, a pharmacy's 'duties include accurately filling and dispensing prescriptions, advising by counseling or providing other information, or the provision of other services that are necessary to providing pharmaceutical care.'"[47] This judicial admission came at the beginning of Walgreens's Motion; a formal and deliberate declaration that should be binding on Walgreens as a matter of course. *Asarco, LLC v. Noranda Mining, Inc.*, 844 F.3d 1201, 1212 (10th Cir. 2017).

Generally a court cannot construct arguments on behalf of Parties or resolve issues not presented. *E.g., Avodah Farms v. O'Hara-Rusckowski*, No. 24-CV-00233-NYW-CYC, 2025 WL 1676509, at *9 (D. Colo. June 13, 2025). And while *sua sponte* summary judgments are not unheard of, Fed. R. Civ. P. 56 (c) itself

_____

[46] Walgreen's Motion for Summary Judgment at 16-22, App. Vol. 1 at 72-78.

[47] *Id.* at 14 (*citing Pharmacare Oklahoma, Inc. v. State Health Care Auth.,* 152 P.3d 267, 273 (Okla. Civ. App. 2007)), App. Vol. at 70.

demands that courts look to the admissions on file. The District Court erred by disregarding Walgreens's judicial admission that it owed a duty to J.J.S., and the entry of summary judgment should be reversed.

### B.  The District Court erred by ignoring Oklahoma common law.

In Oklahoma, the existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking. *Wofford v. E. State Hosp.*, 1990 OK 77, ¶ 10, 795 P.2d 516, 519. The touchstone of this analysis is foreseeability – all defendants generally owe a duty of care to persons foreseeably endangered by their conduct. *Id.* And Oklahoma has rejected the District Court's argument that duty arises only out of statute. *Id.* ("Duty of care is not a concept that arises only by statute. . . Whenever a person is placed in such a position with regard to another that it is obvious that if he did not use due care in his own conduct he will cause injury to the other, the duty at once arises to exercise care commensurate with the situation in order to avoid such injury.").

Additionally, Oklahoma law imposes a duty on all medical professionals to exercise the degree of skill ordinarily employed under similar circumstances by similar specialists. *Runyon v. Reid*, 510 P.2d 943, 950 (Okla. 1973). Other federal courts, interpreting Oklahoma law, have held pharmacies, including Defendant Walgreens, to the normal rules of duty under Oklahoma law. *Cherokee Nation v.*

*McKesson Corp.*, No. CIV-18-056-RAW, 2021 WL 1200093, at *8 (E.D. Okla. Mar. 29, 2021).

At the outset, the District Court's Opinion declares that it will not consider Oklahoma's common law but will instead look only to statutory authority.[48] This contradicts Oklahoma law. *Wofford*, 795 P.2d at 519.

The case cited for the proposition that the common law no longer applies to pharmacists holds just the opposite. *Carista v. Valuck*, 394 P.3d 253, 257 (Okla. Civ. App. 2016) – explicitly states that a pharmacist's duties "**include accurately filling and dispensing prescriptions**, advising by counseling or providing other information, or the provision of other services that are necessary to providing pharmaceutical care" (emphasis added). The District Court made a clear error of law by ignoring this holding.

But the error goes deeper. In *Carista*, the plaintiff argued that a pharmacist owed a duty to consider whether a patient had a history of drug abuse and a duty to prevent a self-inflicted overdose. The *Carista* court first considered whether those duties existed under common law principles, and found that they did not. *Id.* at 257. *Carista* then considered whether those duties were imposed by statute. *Id.* The District Court misinterpreted *Carista* as requiring *only* an analysis of statutes, when the *Carista* opinion plainly does both.

---

[48] Opinion and Order, p. 7, App. Vol. 5 at 9.

This echoes *Kovaly v. Wal-Mart Stores Texas, L.L.C.*, 627 F. App'x 288 (5th Cir. 2015), where the Fifth Circuit reversed a similar summary judgment order. There, as here, the plaintiff offered expert opinion testimony regarding the standard of care for a pharmacist in an emergency situation. The trial judge rejected the testimony because there was a dispute over the application of various duties, statutes, and regulations. The Fifth Circuit reasoned that such disputes were properly the subject of evidentiary combat, where (as here) opinion testimony was necessary to establish how a reasonably prudent pharmacist would act under the same or similar circumstances. *Id.*

The District Court's Opinion explicitly dodges the question of common law duties under Oklahoma law. Because it erred on this question, everything that follows is also erroneous. Oklahoma law requires a pharmacist to behave as a reasonably prudent pharmacist would under the same or similar circumstances. As even Walgreens concedes, this includes a duty to dispense prescriptions. And there is clearly a fact question over whether Walgreens's secret patient-abandonment policy was reasonable under these circumstance. The entry of summary judgment should therefore be reversed.

### C.    The District Court erred in interpreting the Pharmacy Act and related regulations.

Pharmacies are licensed providers entrusted with public health responsibilities. Like any other medical provider, Oklahoma's regulatory scheme

22

imposes duties of confidentiality, patient counseling, error prevention, and compliance with applicable laws. *See* Okla. Admin. Code §§ 535:10-3-1.1, 535:10-9-2, 535:15-3-2. Provisions such as OKLA. STAT. tit. 59, §§ 353.20.1(B) and 353.20.2(A) & (C) acknowledge circumstances permitting discretion—such as missing symptoms or emergency situations—but do not negate the overarching duty to dispense medications lawfully prescribed. Instead, these statutes require pharmacists to exercise professional judgment responsibly, including providing emergency supplies when appropriate.

As for regulations, the court's reliance on permissive language ("may") overlooks the broader context of pharmacists' professional obligations. Oklahoma Administrative Code § 535:10-3-1.2(11) obligates pharmacists to resolve situations of potential harm when apparent or when they should have been apparent. By refusing to fill J.J.S.'s prescription without taking any action to resolve the matter, Walgreens failed to meet this standard. The District Court's assertion that the regulation does not support a duty to fill prescriptions ignores this affirmative obligation to address foreseeable harm.

The District Court's reliance on Okla. Admin. Code § 535:15-3-13(c), as amended in 2022, is particularly problematic. The district court erred when relying on a 2022 amendment to § 535:15-3-13(c) to support its conclusion that Walgreens

owed no duty to fill J.J.S.'s prescription in June 2020.[49] The district court admits that the regulation stating "a pharmacist maintains the right not to fill the valid prescription," did not exist at the time of the events giving rise to this case and makes no indication of retroactive effect. Walgreens's conduct must be evaluated under the law as it stood in 2020, not by a later regulation enacted more than two years afterward.

Oklahoma law presumes that amendments impacting substantive rights are prospective only. *Hodara v. Oklahoma Dep't of Corr.*, 2025 OK 47, ¶ 15, 2025 WL 1748587, __ P.3d __. To hold otherwise would destroy vested rights, including the right of the Scholl family to sue for negligence. As the District Court conceives of it, legislative amendments can retroactively immunize Walgreens from liability. That is not the case under Oklahoma law. Similarly, the U.S. Supreme Court agrees that retroactivity is disfavored and must not be imposed unless the language of the enactment requires that result. *Landgraf v. USI Film Products*, 511 U.S. 244, 264 (1994). As the Supreme Court explained, "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly," and emphasized that "settled expectations should not be lightly disrupted." *Id.* at 265–66. Here, the 2022 regulatory amendment was silent as to retroactive effect, and the district court's application of that provision

---

[49] Opinion and Order, p. 9-10, App. Vol. 5 at 11-12.

to the pharmacist's conduct occurring in 2020 contravenes both Oklahoma law and constitutional norms.

Separately, § 535:15-3-13(c) now recognizes a pharmacist's "right not to fill the valid prescription," but does so only in the narrow context of a concern over a "legitimate medical purpose." Critically, the record does not show that Walgreens invoked professional judgment or relied on a "legitimate purpose" rationale in declining to fill J.J.S.'s prescription.

Instead, Walgreens argued that there was no time limit on when it should provide the prescription. The District Court waded into the facts, supplanting the jury by declaring that there were no relevant communications after June 16, 2020. But deposition testimony indicates that Ms. Scholl did in fact call Walgreens and provide the authorization number; there was a genuine dispute of material fact over the call logs, with Walgreens claiming it had no record of the call but Ms. Scholl providing phone records proving its existence. The District Court erred by deciding this disputed fact issue in favor of Walgreens; the truth should have been decided by a jury.

The District Court erroneously concluded that Okla. Admin. Code 535:10-3-1.1(6) which states that "[t]he health and safety of patients shall be a pharmacist's first consideration," applies only to confidentiality obligations. This is simply

25

incorrect. While the provision is located within a section addressing professional conduct, the language is broad and unqualified.

Similarly, Okla. Admin. Code 535:10-3-1.2(11) states that it is professional misconduct when a pharmacist fails "to make a reasonable attempt to prevent, resolve or correct a prescription error or situation which may cause harm to the patient when apparent or should have been apparent." This duty is not confined to typos. It encompasses broader patient-safety scenarios, including foreseeable harm caused by delay or refusal in providing timely medication. Pharmacists are not merely transactional dispensers; they are licensed healthcare professionals charged with protecting patient welfare.

Contrary to the court's assertion, recognizing these regulatory duties does not create new or inconsistent obligations. Rather, it harmonizes with longstanding Oklahoma principles governing healthcare providers. For example, in *Sparks v. Hicks*, 912 P.2d 331 (Okla. 1996), the Oklahoma Supreme Court held that a physician may not abandon a patient without providing reasonable notice and the opportunity to obtain alternative treatment. *Jackson v. Oklahoma Memorial Hospital*, 909 P.2d 765, 774 (Okla. 1995), reaffirmed that healthcare professionals must continue care unless justified by specific circumstances. The District Court's blasé declaration that pharmacists may let their patients suffer and die (for any reason or for no reason) has no apparent basis in any law. And where a pharmacist (like

Walgreens here) knows that the patient is in an emergency, this conclusion is particularly grotesque.

Finally, the court's reliance on Okla. Admin. Code 535:15-3-13(c) and Okla. Stat. tit. 59, § 353.20.2(C) is misplaced. These provisions merely recognize that pharmacists are not *compelled* to fill a prescription under all circumstances, for instance, if doing so would violate safety protocols or legal standards. But they do not grant blanket immunity for arbitrary or unjustified refusal to act. Recognizing that a pharmacist may decline to fill a prescription in specific, justified scenarios cannot negate the existence of an underlying duty to act reasonably, timely, and in good faith where no such justification exists.

Here, Walgreens admitted that it was aware of J.J.S.'s life-threatening condition, yet they failed to act with even minimal diligence or urgency. They abandoned J.J.S. during a dire medical episode. This was negligence.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court reverse the District Court's Opinion and Order, and remand for further proceedings, either to address and respond to the District Court's *sua sponte* arguments or to proceed to trial with a jury.

Respectfully submitted,

/s/ Andrew C. Jayne
Andrew C. Jayne, OBA #19493
Jason A. McVicker, OBA #31150
Bryan J. Seaton, OBA #36248
JAYNE PETERS MCVICKER
BURKE ASKEW & PARKER
401 S. Boston, Suite 2000
Tulsa, OK 74103
 (t) (918) 938-7944; (f) (918) 938-7966
ajayne@jpmlawgroup.com
jmcvicker@jpmlawgroup.com
bseaton@jpmlawgroup.com
*ATTORNEYS*
*APPELLANTS/PETITIONERS*

## CERTIFICATE OF COMPLIANCE

I certify that this filing complies with applicable word limits of Fed. R. App.

P. 32 (a)(7)(B) because it is only 6272 words (excluding words exempt under Fed.

R. App. P. 32 (f)), and certify that it complies with Fed. R. App. 32(a)(5)'s typeface

requirements, and Fed. R. App. 32(a)(6)'s type style requirements.

/s/ Andrew C. Jayne
Andrew C. Jayne, OBA #19493

## STATEMENT OF COUNSEL AS TO ORAL ARGUMENT

Appellant respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Tenth Circuit Rule 34.1. Oral argument will assist the Court in resolving the important legal and factual issues presented in this appeal, including the district court's interpretation of Oklahoma pharmacy law and the district court's sua sponte adoption of legal theories not raised or briefed by the Appellees.

This appeal presents a novel question under Oklahoma law: whether a pharmacy owes a common-law general duty not to abandon a patient without proper notice after voluntarily undertaking the procedural process of filling a time-sensitive prescription. The district court's decision rests on predictions about unsettled state law, and improper resolution of material factual disputes concerning the existence of a pharmacist-patient relationship and the pharmacy's conduct.

Given the nuance of the record, the statutory and regulatory framework governing pharmacies, and the potential impact of this case on the developing law of pharmacist liability in Oklahoma, oral presentation and dialogue with the Court would materially aid in the decisional process.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of July, 2025, I electronically transmitted the above and foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Steven E. Holden
Caleb McKee
HOLDEN LITIGATION
15 East 5th St., Suite 3900
Tulsa, OK 74103
Email:
SteveHolden@holdenlitigation.com
CalebMcKee@holdenlitigation.com

James E. Goldschmidt
Stacy A. Alexejun
Nathan J. Oesch
Ellen E. Anderson
QUARLES & BRADY LLP
33 E. Main Street, Suite 900
Madison, WI 53703
Email:
james.goldschmidt@quarles.com
stacy.alexejun@quarles.com
nathan.oesch@quarles.com
ellen.anderson@quarles.com

***ATTORNEYS FOR APPELLEE/ RESPONDENT***

*/s/ Andrew C. Jayne*
Andrew C. Jayne, OBA #19493

30

EXHIBIT A

# United States District Court
## for the Northern District of Oklahoma

---

Case No. 21-cv-363-JDR-MTS

---

ERIC F. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; JACQUELINE R. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; J.J.S., *a minor child*,

<em>Plaintiffs</em>,

<em>versus</em>

WALGREENS SPECIALTY PHARMACY, LLC, *doing business as Alliance Rx Walgreens Prime*,

<em>Defendant</em>.

---

## OPINION AND ORDER

---

The facts of this case are undeniably tragic: Plaintiffs Eric and Jacqeline Scholl's minor daughter, J.S., was diagnosed with a rare condition that prevents her body from expelling fluid and other materials from her uterus during menstruation. Faced with limited treatment options, some of which carry long-term negative consequences, the Scholls elected to temporarily treat J.S. with Lupron Depot, a medication that would suppress J.S.'s menstruation until she was older and better able to understand the risks of the other, permanent treatment options. J.S.'s physician, Dr. Hildebrand, submitted a prescription for Lupron Depot to Defendant Walgreens Specialty Pharmacy, LLC. But the prescription went unfilled for over forty days. During that period, J.S. experienced complications that necessitated emergency surgery and two separate hospitalizations.

The Scholls sued Walgreens in Oklahoma state court alleging that J.S. would not have needed to undergo surgery or experience the pain associated

Case No. 21-cv-363

with her medical complications if Walgreens had timely filled J.S.'s prescription. Dkt. 2-1. Walgreens removed the action to this Court [Dkt. 2] and subsequently filed a motion for summary judgment, which is now fully briefed. Dkts. 41, 46, 53.[1] In their briefs, the parties engage in detailed arguments about who communicated what to whom, and when. Although the parties' arguments are complicated, the questions for this Court to resolve are straightforward: Did Walgreens owe Plaintiffs a duty to fill J.S.'s prescription, and if not, did Walgreens have a duty to provide Plaintiffs with additional information about the status of that prescription? The Oklahoma Courts have not expressly spoken on this issue, so the Court must attempt to predict, under *Erie*, how the Oklahoma Supreme Court would rule.[2] *Iron Bar Holdings, LLC v. Cape*, ___ F.4th ___, 2025 WL 840797, at *8 (10th Cir. March 18, 2025). The Court predicts that the Oklahoma Supreme Court would answer both questions in the negative. The Court therefore grants Walgreens's motion for summary judgment [Dkt. 41].

I[3]

In May 2020, J.S. was diagnosed with vaginal agenesis, a soft-tissue obstruction that prevents the body from expelling materials associated with menstruation. Dkt. 41 at 5; Dkt. 46 at 5. Her physician, Dr. Hildebrand, advised that the condition could be treated by either a complete hysterectomy or surgery to remove soft tissue from the vaginal canal. Dkt. 46 at 12; Dkt. 53 at 2. The former option would prevent J.S. from bearing children of her own. The latter would require a long and painful recovery, and Dr. Hildebrand was concerned that the recovery might be too painful and difficult for a twelve-year-old child. Dkt. 46 at 12. Dr. Hildebrand recommended temporarily

---

[1] All citations utilize CMECF pagination.

[2] The *Erie* doctrine requires federal courts to apply state substantive law when resolving disputes not directly implicating a federal question. *Erie R.R. Co. v. Thompkins*, 304 U.S. 64, 78 (1938).

[3] The facts set forth in this section are undisputed unless otherwise noted.

Case No. 21-cv-363

treating J.S. with Lupron Depot, a hormone injection that prevents ovulation, until she was old enough to decide between the two permanent treatment options. *Id.* at 13.

Faced with "three bad choices," the Scholl family opted to temporarily defer surgery by administering the Lupron Depot shots. Dkt. 46 at 13; Dkt. 53 at 2. On June 1, 2020, Dr. Hildebrand's office sent a referral to Abbvie, the manufacturer of Lupron Depot, for the prescription. Dkt. 41 at 5; Dkt. 46 at 5. Abbvie, in response, recommended that Dr. Hildebrand obtain preauthorization for the medication, advised Dr. Hildebrand that she might be required to provide additional clinical information to support the prescription request, and informed her that the "approximate turn-around time" for the medication would be "7-14 days after initiation with the insurance company." Dkt. 41 at 6; Dkt. 46 at 5.

Walgreens received prescription information from Abbvie on June 2, 2020. Dkt. 41 at 9.[4] Dr. Hildebrand's office validated the prescription the following day. Dkt. 41 at 3. Walgreens performed a benefits investigation to determine whether the prescription would be covered by the Scholls' health insurer, Blue Cross and Blue Shield of Oklahoma. *Id.*; Dkt. 46 at 8.[5] On June 11, 2020, Walgreens determined that preauthorization for the prescription was required and that only Dr. Hildebrand could initiate the preauthorization process. Dkt. 41 at 9-10; Dkt. 46 at 8. Accordingly, Walgreens faxed preauthorization paperwork to Dr. Hildebrand's office on June 11, 2020. Dkt. 41 at 10; Dkt. 46 at 8. The paperwork stated that the insurer "[would] only accept a

---

[4] The parties dispute whether the information from Abbvie constituted a valid prescription. *See* Dkt. 46 at 8. The dispute is not material to the Court's analysis.

[5] The Scholls dispute many of the factual statements set forth in section II.D of Walgreens's brief, [Dkt. 46 at 8], but the evidence cited by the Scholls does not establish a genuine dispute regarding any of the limited facts set forth in this paragraph. Fed. R. Civ. P. 56(c).

Case No. 21-cv-363

call from the doctor's office to begin the process" and "[would] not take in-
formation from the pharmacy." Dkt. 41-13.

On June 15, Walgreens informed Ms. Scholl that it could not fill J.S.'s
prescription until it received preauthorization. Dkt. 41 at 11; Dkt. 46 at 8.[6]
Walgreens had two discussions with Dr. Hildebrand's office regarding the
need for preauthorization that same day. Dkt. 41 at 10-11. On or before June
16 at 10:48 a.m., Walgreens spoke with Dr. Hildebrand's office a third time
and learned that no preauthorization request had been initiated. Dkt. 41 at 10-
11.[7] Walgreens then placed the prescription on hold and later closed the pre-
scription file. *Id.* at 12; Dkt. 46 at 9.

The parties agree that Dr. Hildebrand received a preauthorization
number for the prescription from Blue Cross Blue Shield at approximately
12:53 p.m. on June 16, 2020. Dkt. 41 at 12; Dkt. 46 at 10.[8] They disagree,
however, about whether and when this information was communicated to
Walgreens. The Scholls contend that both Dr. Hildebrand's office and Ms.
Scholl provided Walgreens with the preauthorization number the day they
received it. Walgreens denies this. *Compare* Dkt. 46 at 17, *with* Dkt. 53 at 7-8.
The Court construes this dispute in favor of the Scholls and assumes that the

---

[6] Ms. Scholl does not dispute the contents of the call recited by Walgreens but adds
that she offered to pay for the prescription out-of-pocket during this call and was told—
incorrectly—that she could not do so. Dkt. 46 at 8. The Court accepts Ms. Scholl's addi-
tional facts as true for purposes of this opinion.

[7] The Scholls dispute the precise timing of one call and the party responsible for
initiating another. Dkt. 46 at 8-9. These details are not material to the Court's analysis. The
Scholls do not dispute the timing of the June 16 call, nor do they dispute Walgreens's claim
that the need for preauthorization was communicated to Dr. Hildebrand's office during
these calls. Dkt. 46 at 9. The Scholls do not dispute Walgreens's assertion that there was
no preauthorization on file by 10:48 a.m. on June 16, 2020. *See* Dkt. 41 at 11-12; Dkt. 41-15;
Dkt. 41-27; Dkt. 46 at 9.

[8] The Scholls allege that, had Walgreens called Blue Cross Blue Shield after 2:55
p.m. on June 16, Walgreens would have been given the preauthorization number. Dkt. 46 at
18; Dkt. 53 at 8. Walgreens does not deny that it would have received the number if it had
contacted Blue Cross Blue Shield, but denies it had any obligation to do so. Dkt. 53 at 8-9.

4

Case No. 21-cv-363

information was communicated to Walgreens at approximately 12:53 p.m. on June 16, 2020. There is no evidence or testimony as to what Walgreens said when it received the preauthorization, nor is there any evidence indicating that Walgreens agreed, promised, or otherwise indicated it would begin the process of filling the prescription upon receipt of the preauthorization number on June 16.

Although the parties disagree about who made contact with whom on June 16, they agree that communications between the parties ceased, for a time, after that date. Dkt. 41 at 11-13; Dkt. 46 at 9. Walgreens did not contact the Scholls, Dr. Hildebrand's office, or Blue Cross Blue Shield to request a preauthorization number at any time between June 17 and July 12, 2020, and neither the Scholls nor Dr. Hildebrand called Walgreens to check on the status of the prescription during that time. Dkt. 41 at 11-13; Dkt. 46 at 9. Walgreens's file for J.S.'s Lupron Depot shot remained closed during this twenty-six-day period. Dkt. 41 at 12; Dkt. 46 at 9.

On July 8, 2020, J.S. was hospitalized with extreme abdominal pain. Dkt. 46 at 18; Dkt. 53 at 8. She underwent surgery to remove both her appendix and blood that had accumulated in her pelvic cavity. Dkt. 41 at 14. She was discharged on July 11, 2020. *Id.* Two days later, one of Dr. Hildebrand's employees, Kristen Cornwell, called Walgreens and advised that J.S. needed the Lupron Depot shot as soon as possible. Dkt. 46 at 18. Walgreens informed Ms. Cornwell that the prescription file had been closed because Walgreens had not received the required preauthorization. Dkt. 41 at 14; Dkt. 41-9 at 3.[9] Ms. Cornwell responded that the preauthorization number was "updated"

---

[9] The Scholls contend that Walgreens's exhibit 9 does not support all of the factual representations set forth in Walgreens's motion. Dkt. 46 at 44. They do not, however, point to any evidence that contradicts the information set forth in exhibit 9. The Court concludes that exhibit 9 adequately supports the limited facts set forth herein.

Case No. 21-cv-363

and that J.S. needed the medication as soon as possible. Dkt. 41 at 14; Dkt. 41-9 at 3. Walgreens created a fill request in response to this call. Dkt. 41-9.

J.S. was re-admitted to the hospital on July 15, 2020, with symptoms of abdominal pain and vomiting. Dkt. 41 at 14; Dkt. 46 at 11. On July 16, Ms. Cornwell again called Walgreens and stated that J.S. needed the Lupron Depot injection as soon as possible and could not be discharged without it. Dkt. 41 at 14; Dkt. 46 at 11. That same day, Walgreens verified that the preauthorization had been approved by the Scholls' insurer and elevated the prescription request to "stat" priority pending verification of insurance benefits. Dkt. 41 at 15. J.S. was discharged on July 17, 2020, and consent to ship the prescription to Dr. Hildebrand's office was obtained that same day. *Id.* The medication was delivered to Dr. Hildebrand's office on July 21, 2020, where it was administered to J.S. Dkt. 46 at 19; Dkt. 53 at 9.

On July 30, 2021, the Scholls sued Walgreens for negligence in Tulsa County district court. Dkt. 2-1. Walgreens removed the case to this Court. Dkt. 2. The Scholls' petition, which was never amended and remains the operative pleading, alleges that Walgreens negligently failed to deliver the Lupron Depot shot to Dr. Hildebrand in a timely manner and that J.S. suffered damages in the form of unnecessary surgery, medical expenses, and pain and suffering as a result of Walgreens's negligent conduct. Dkt. 2-1 at 6. Walgreens now asks this Court for an order granting summary judgment in its favor on the sole claim in the petition. Dkt. 41.

## II

Summary judgment is appropriate if there exist no genuine disputes as to any material fact and the moving party "'is entitled to judgment as a matter of law.'" *Schrock v. Wyeth, Inc.,* 727 F.3d 1273, 1279 (10th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)). The Court must view the facts and draw all inferences in the light most favorable to the non-moving party. *Id.* The parties agree that Oklahoma law governs this dispute, and it is therefore this Court's obligation

to "'interpret and apply the law of [Oklahoma] as . . . the [Oklahoma] Su-
preme Court would.'" *Id.* at 1280 (bracketed alterations in original) (quoting
*High Plains Natural Gas Co. v. Warren Petroleum Co.*, 875 F.2d 284, 288 (10th
Cir.1989)).[10] Where the Oklahoma Supreme Court has not addressed a legal
issue, this Court "may seek guidance from decisions rendered by lower courts
in [Oklahoma], appellate decisions in other states with similar legal princi-
ples, district court decisions interpreting the law of [Oklahoma], and the gen-
eral weight and trend of authority in the relevant area of law." *Id.* (quoting
*Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir.2007)).

### III

    The threshold question is this: Did Walgreens have a duty to fill J.S.'s
prescription for Lupron Depot? *See Lowery v. Echostar Satellite Corp.*, 2007
OK 38, ¶ 12, 160 P.3d 959, 964 (recognizing that the "existence of a duty of
care is the threshold question in any negligence action" (citation omitted)).
If the Court answers this question of law in the affirmative, it may then deter-
mine whether Walgreens breached that duty and whether J.S. was injured as
a result. *See id.* (setting forth the three essential elements of a negligence
claim). If not, "there can be no liability for negligence as a matter of law." *Id.*

    Ordinarily, the Court would begin its analysis by looking to the deci-
sions of the Oklahoma Supreme Court. *See Schrock,* 727 F.3d at 1280. In this
case, however, Oklahoma has enacted a legal and regulatory scheme that gov-
erns the duties and obligations of pharmacists and pharmacies. *See* Okla. Stat.
tit. 59, §§ 353 *et seq.* (Oklahoma Pharmacy Act); Okla. Admin. Code §§ 535:1-
1-1 *et seq.* Oklahoma courts addressing the duties owed by pharmacists and
pharmacies will generally begin by examining the plain language of these pro-
visions. *E.g., Carista v. Valuck*, 2016 OK CIV APP 66, ¶¶ 9-14, 394 P.3d 253,

---

[10] *See also Riley v. Brown & Root, Inc.*, 896 F.2d 474, 477–78 (10th Cir.1990) (recog-
nizing that a trial court must "'ascertain and apply the state law where ... it controls [the]
decision'" (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944))).

Case No. 21-cv-363

258-59 (finding no indication that the legislature or board of pharmacy intended to impose a duty to question clients about illegal drug use and declining to create a duty that was "unsupported by existing Oklahoma state law or regulations"); *Pharmcare Oklahoma, Inc. v. State Health Care Auth.*, 2007 OK CIV APP 5, ¶ 30, 152 P.3d 267, 273 (recognizing that a "pharmacist's duty to [a] patient is clearly defined and limited under the Pharmacy Act"). This Court will do the same.

The Oklahoma Pharmacy Act is intended to "promote, preserve and protect the public health, safety and welfare by and through the effective control and regulation of the practice of pharmacy . . . ." Okla. Stat. tit. 59, § 353(B). The Act is silent as to whether a pharmacy or pharmacist has a duty to fill a prescription, but generally speaking, the Act suggests that dispensing medication is something that a pharmacist *may* do, rather than something she *must* do. *E.g., id.* at § 353.20.1(B) (recognizing that a pharmacist "may" fill a prescription when a symptom or purpose is not provided by the practitioner); *id.* at § 353.20.2(A) & (C) (permitting pharmacists to dispense varying quantities and indicating that a pharmacist "may dispense" medications without a prescription in certain, limited circumstances). In contrast, the Oklahoma Pharmacy Act *requires* pharmacists to engage in other conduct, such as transferring prescriptions upon a customer's request. *Id.* at § 354. Thus, while the Act requires pharmacists and pharmacies to engage in certain conduct, it does not expressly impose on pharmacists or pharmacies an affirmative duty to fill prescriptions.[11]

---

[11] The Court notes that Okla. Stat. tit. 59, § 353.20.2(C)(3) provides that a pharmacist who dispenses life-saving medication "in good faith" shall not be liable for civil damages "as a result of any acts or omissions except for committing gross negligence or willful or wanton acts committed in dispensing or failure to dispense" medication. Although an argument could be made that this provision recognizes the potential for liability due to "failure to dispense" a medication, the Court concludes otherwise. At most, this section recognizes that a pharmacist may be civilly liable for "willful or wanton acts committed in dispensing or failure to dispense" a medication. *Id.* It does not suggest that a duty to dispense

8

Case No. 21-cv-363

The Oklahoma State Board of Pharmacy[12] "regulate[s] the practice of
pharmacy" and the "dispensing of drugs and medicines." Okla. Admin. Code
§§ 535:10-1-1, 535:15-1-1(a). Among other things, the Board's regulations re-
quire pharmacists to act in conformity with federal, state, and local laws; to
maintain patient confidentiality; to provide appropriate counseling; to make
reasonable efforts to maintain patient information generated at a pharmacy;
and to refrain from conduct such as making false reports, refusing to provide
prescription information upon request, and refilling prescriptions without au-
thorization. *Id.* at §§ 535:10-3-1.1 & 1.2, 535:10-9-2. The regulations further
require pharmacies to establish and maintain controls against prescription er-
rors; to prevent the improper diversion of prescription drugs in violation of
federal, state, and local law; and to report any theft or significant loss of drugs.
*Id.* at § 535:15-3-2(c) & (j).

Although there are many things that pharmacists and pharmacies
must do under the Oklahoma Pharmacy Board's regulations,[13] filling pre-
scriptions is not one of them. Title 535 of the Administrative Code, like the
Oklahoma Pharmacy Act, generally uses permissive language when referring
to the filling of prescriptions. *E.g.,* Okla. Admin. Code § 535:15-3-11(b) (stat-
ing that prescriptions "may" be refilled as authorized, and that, after one
year, a new prescription "shall" be required).

When J.S.'s prescription was issued in June 2020, the Administrative
Code did not expressly address whether a pharmacist had an obligation to fill

---

prescription medication exists as a general matter. This finding is corroborated by the reg-
ulations governing pharmacists and pharmacies in Oklahoma, discussed *infra*.

[12] The legislature created the State Board of Pharmacy and empowered it to regulate
the practice of pharmacy and the sale and distribution of drugs and medicine, to adopt rules
of conduct applicable in the profession of pharmacy, and to make rules necessary for carry-
ing out and enforcing the Oklahoma Pharmacy Act and protecting the public. Okla. Stat.
tit. 59, §§ 353.3, 353.7, 355.2(B).

[13] *See, e.g.,* Okla. Admin. Code §§ 535:10-3-1.1 & 1.2, 535:10-9-2.

Case No. 21-cv-363

a prescription. In September 2022, however, the Pharmacy Board amended
section 535:15-3-13(c) to "clarif[y] a pharmacist's right not to fill a valid pre-
scription." 2022 OK REG TEXT 600564 (NS). *See* Okla. Admin. Code §
535:15-3-13(c) (providing that a "pharmacist maintains the right not to fill the
valid prescription"). This amendment expressly provided what was previ-
ously only implied: Oklahoma's comprehensive statutory and regulatory
scheme does not impose a duty to fill prescriptions.[14]

The Scholls point to two provisions of the Oklahoma Administrative
Code that, they contend, support the existence of a duty to fill a prescription.
Dkt. 46 at 21. The first, section 535:10-3-1.1(6), states that the safety of health
and patients "shall be a pharmacist's first consideration." This provision ap-
plies specifically to a pharmacist's obligations of confidentiality; it has no
bearing on a pharmacist's obligation to fill a prescription as a general matter.
Okla. Admin. Code § 535:10-3-1.1(6). The second, section 535:10-3-1.2(11),
states that a pharmacist violates the rules of professional conduct when he
does not attempt to "resolve a possible prescription error" or a "situation of
potential harm to the patient when apparent or should have been apparent to
the pharmacist. *Id.* at § 535:10-3-1.2(11). The plain language of these provi-
sions does not support the creation of a duty to fill a prescription, and the
Court declines to read these regulations in the broad manner proposed by the
Scholls. Furthermore, if the Court were to interpret either of these regula-
tions as creating a duty to fill a prescription, the Court would create new ob-
ligations that are at odds with other express provisions in both the Oklahoma
Pharmacy Act and the Oklahoma Administrative Code. *E.g.* Okla. Admin.

---

[14] Oklahoma courts determine the retroactive impact of an amendment by examin-
ing the circumstances surrounding the amendment. *See Samman v. Multiple Inj. Tr. Fund*,
2001 OK 71, ¶ 13, 33 P.3d 302, 307. Amendments that are intended to clarify a prior legis-
lative enactment or resolve an existing ambiguity are given retrospective force. *Polymer Fab-
ricating, Inc. v. Emps. Workers' Comp. Ass'n*, 1998 OK 113, ¶ 15, 980 P.2d 109, 114. Based on
the reasoning in *Samman* and *Polymer Fabricating*, the Court construes the amendments to
section 535:15-3-13(c) as having retroactive effect.

Case No. 21-cv-363

Code § 535:15-3-13(c) (recognizing that a pharmacist has no duty to fill a pre-
scription); Okla. Stat. tit. 59, § 353.20.2(C) (stating that pharmacists *may* dis-
pense medication to save the life of a patient without *requiring* pharmacists
to do so). The Court will not interpret Oklahoma's regulations in a manner
that creates internal inconsistencies within the statutory and regulatory
framework governing the practice of pharmacy.

There are no Oklahoma Supreme Court cases directly addressing
whether a pharmacy has a general duty to fill a prescription upon request;
however, a 2016 decision from the Oklahoma Court of Civil Appeals is in-
structive. In *Carista v. Valuck*, the plaintiff sued a pharmacy that had dis-
pensed painkillers to her brother who ultimately died of an overdose. The
plaintiff alleged that the pharmacist should have considered the risk created
by her brother's use of and dependency on illegal drugs when determining
whether to fill his prescription. *Carista*, 2016 OK CIV APP 66, ¶¶ 2, 12, 394
P.3d 253, 255, 258. After reviewing the laws and regulations governing the
practice of pharmacy, the court of civil appeals found "no indication that the
Board of Pharmacy intended to create a duty for pharmacists to question cli-
ents regarding illegal drug use," and concluded that the plaintiff's attempt to
assert such a duty "wander[ed] too far afield from the regulatory text." *Id.* at
¶¶ 12-13, 394 P.3d at 258-59. Recognizing that the Oklahoma Pharmacy Act
"clearly define[s] and limit[s]" the duties of pharmacists to their patients, the
court of appeals declined to expand the duties of pharmacists in a manner
"unsupported by existing Oklahoma state law or regulations" and affirmed
dismissal of the plaintiff's complaint. *Id.* at ¶¶ 7, 14, 17, 394 P.3d at 257, 258-
59 (quoting *Pharmcare*, 2007 OK CIV APP 5, ¶¶ 29-30, 152 P.3d 267).[15]

---

[15] In *Pharmcare*, the Oklahoma Court of Civil Appeals found that the duties of phar-
macists include "accurately filling and dispensing prescriptions," among other things.
*Pharmcare*, 2007 OK CIV APP 5, ¶ 30, 152 P.3d at 273. The court in *Pharmcare* did not
address the question of whether a pharmacist has a duty to fill a prescription as a general

Case No. 21-cv-363

This Court predicts, based on the reasoning in *Carista*, that Oklahoma courts would hold that neither pharmacists nor pharmacies have a general duty to fill prescriptions. *See also Williams v. Albertsons, Inc.*, No. 95-50473, 1996 WL 167215, at *1 (5th Cir. 1996) (per curiam) (unpublished) (concluding that a pharmacy does not have a general duty to fill a prescription even where the patient had filled her prescription at the pharmacy for many years prior to the refusal). The laws and regulations defining and limiting the obligations of pharmacists do not support the creation of that duty. *Carista*, 2016 OK CIV APP 66, ¶¶ 7, 14, 394 P.3d at 257-59. Furthermore, the creation of a duty to fill a prescription would be flatly inconsistent with the regulation recognizing that pharmacists have, and have always had, an unrestricted right to refuse to fill a prescription. *See* Okla. Admin. Code § 535:15-3-13(c). It is not the role of the federal courts to create common-law rules that run counter to the laws and regulations adopted by the state. *Cf. Finnell v. Seismic*, 2003 OK 35, ¶ 15, 67 P.3d 339, 345 (recognizing that, in Oklahoma, "[s]tatutes in derogation of the common law are to be liberally construed so as to effect legislative intent" (citing Okla. Stat. tit. 25, § 29)). Accordingly, the Court concludes that, as a matter of Oklahoma law, Walgreens did not have an affirmative duty to fill J.S.'s prescription.

IV

The Scholls argue that, even if Walgreens did not have a general duty to fill J.S.'s prescription, Walgreens nevertheless undertook a duty to J.S. and had an obligation to exercise ordinary care, diligence, and judgment in carrying out that duty. *See* Dkt. 46 at 20-23. They argue that Walgreens failed to exercise the requisite level of care with respect to its conduct between June 1 and July 13.[16] In support of this argument, the Scholls point to case law

---

matter, and the Court construes this language as a requirement that prescriptions be filled accurately.

[16] Although the Scholls continued to have issues filling J.S.'s prescription, they have not pointed to any injuries that were caused by Walgreens's conduct after July 13. *See* Dkt.

Case No. 21-cv-363

addressing (A) the duty of physicians, lawyers, and other professionals to pro-
vide services in accordance with the standards of other specialists in their
field [Dkt. 46 at 22-23]; (B) a physician's duty not to abandon his or her pa-
tient [Dkt. 46 at 21]; (C) a pharmacist's duty to notify patients of the need for
preauthorization under Massachusetts law [Dkt. 46 at 22]; and (D) general
negligence principles [Dkt. 23]. The Scholls' arguments, and the authority
they rely upon, are unavailing.

A

The Court begins with the Scholls' claim that pharmacists—like law-
yers and physicians—have a duty to provide care in accordance with the
standards of other specialists in their field. Dkt. 46 at 22. Although the gen-
eral premise recited by the Scholls is correct, its application is limited: Doc-
tors and lawyers do not "owe a duty to exercise their particular talents,
knowledge, and skill on behalf of every person they encounter in the course
of the day." *St. John v. Pope*, 901 S.W.2d 420, 423 (Tex. 1995) (cited with ap-
proval in *Jennings v. Badgett*, 2010 OK 7, 230 P.3d 861). Instead, they owe
duties to those with whom they have a specialized contractual relationship,
namely, their clients. *E.g., Jennings*, 2010 OK 7, ¶ 27, 230 P.3d at 868 (recog-
nizing that a "malpractice action is one of negligence wherein the duty is born
from a contractual relationship"); *Haney v. State*, 1993 OK 41, ¶ 18, 850 P.2d
1087, 1092 (ordering dismissal of negligence claim where there was no attor-
ney-client relationship with the plaintiff).[17]

There is no evidence that supports the conclusion that Walgreens had
a contractual relationship with J.S. or her parents that gave rise to an

---

46 at 26-27; (arguing that J.S.'s pain, suffering and surgeries were the result of Walgreens's,
delay, refusal to accept a cash payment, failure to communicate, and abandonment of J.S.
on June 16); Dkt. 46-3 at 40 (denying any claim for damages for events after July 21, 2020);
Dkt. 46-8 at 8-9. Accordingly, the Court focuses its analysis on the alleged failures that took
place on or before July 13, 2020.

[17] *See also, e.g., Jennings*, 2010 OK 7, ¶ 15, 230 P.3d at 865-66 (collecting cases hold-
ing that a physician's duty arises in the context of a physician-patient relationship); *Manley*

Case No. 21-cv-363

affirmative duty to provide them with professional pharmacy services. Although the parties have presented evidence suggesting that Walgreens had a contractual relationship with Blue Cross Blue Shield [Dkt. 46-3 at 31], the Scholls have not pointed to any evidence that Walgreens owed contractual duties to J.S. or her parents under the terms of that agreement either directly or as third-party beneficiaries. *Cf. Jennings*, 2010 OK 7, ¶ 14, 230 P.3d at 866 (recognizing that a contractual relationship is "essential to an action for a breach of the duty giving rise to the malpractice action"); *Okla. Bar Ass'n v. Gassaway*, 2008 OK 60, ¶ 74, 196 P.3d 495, 509 (concluding no attorney-client relationship existed if the parties never "entered into a contract or discussed fees"). Thus, the contractual relationship that would ordinarily give rise to an affirmative duty to provide professional services—and use ordinary care when providing them—is absent in this case.

Nor can a contractual relationship and a corresponding duty be inferred from the parties' course of conduct. The Scholls have not pointed to any evidence that Walgreens and the Scholls had a "meeting of the minds" with respect to the material terms and provisions under which Walgreens would provide pharmacy services. *See Young v. Chappell*, 2010 OK CIV APP 76, ¶ 8, 239 P.3d 476, 479 (recognizing that, to be enforceable, a contract requires a "meeting of the minds on all the essential terms" (citation and internal quotation marks omitted)). To the contrary, the evidence shows that Walgreens (1) refused to accept the Scholls' cash payment for the prescription,[18] and (2) began investigating whether it *might* fill the prescription under

---

*v. Brown*, 1999 OK 79, ¶ 8, 989 P.2d 448, 452 (recognizing that a plaintiff in a legal negligence action must establish, among other things, the existence of an attorney-client relationship).

[18] The evidence, viewed in the Scholls' favor, shows that Walgreens could have accepted a cash payment to fill the prescription but did not do so. Regardless of whether Walgreens was incorrect in its reasons for refusing the payment, the fact remains that the payment was refused; there was no agreement under which Walgreens undertook to provide pharmacy services to J.S.

Case No. 21-cv-363

the Scholls' insurance plan *but stopped all attempts* to gather information or
fill the prescription on June 16 at 10:48 a.m. when it concluded that it lacked
the information necessary to proceed. Although the Scholls maintain that
they provided a preauthorization number to Walgreens shortly after
Walgreens placed J.S.'s prescription on hold, they have not cited any testi-
mony indicating that Walgreens agreed to fill the prescription upon receipt of
that information or otherwise suggested that it would begin providing phar-
macy services to J.S. upon receipt of that information.[19]

    Simply put, the Scholls have not introduced evidence that, if true,
could establish as a matter of Oklahoma law that Walgreens undertook a duty
to provide pharmacy services to J.S. on or before July 13, 2020, when
Walgreens affirmatively represented that it would verify the preauthorization
and begin filling the prescription. Dkt. 41 at 14. Instead, the record evidence
establishes that, prior to July 13, 2020, Walgreens had not established a con-
tractual relationship with the Scholls, nor had it undertaken an affirmative
duty to provide J.S. with pharmacy services as a matter of Oklahoma law. *See,
e.g., Gassaway*, 2008 OK 60, ¶ 74, 196 P.3d 495, 509 (finding that no attorney-
client relationship was established when the parties never entered a contract
or discussed fees, even though the attorney had received documents and vis-
ited with the client on multiple occasions); *Brisco v. Gerard*, 2023 OK CIV
APP 19, ¶¶ 14-15, 530 P.3d 75, 79 (finding no physician-patient relationship
where the doctor did not evaluate, examine, or consult with the plaintiff, but
instead simply determined whether he should be admitted to a facility).[20]

---

  [19] *See* Dkt. 41-13 (stating that the "patient's insurance drug card plan is requesting
a Prior Authorization"); Dkt. 46-3 at 45 (testifying that Walgreens received the preauthor-
ization without providing any information regarding Walgreens's response); Dkt. 46-6 at 7
(same). None of this evidence demonstrates that Walgreens affirmatively agreed to fill the
prescription at any point prior to July 13.

  [20] *Cf. Oklahoma Bar Ass'n v. Dobbs*, 2004 OK 46, ¶ 19, 94 P.3d 31, 44 (finding an
attorney-client relationship existed once the attorney undertook to provide services in the
client's name and held himself out as her attorney).

Case No. 21-cv-363

Because the evidence does not establish the existence of a pharmacist-client relationship, the Scholls' claim that Walgreens failed to provide the care owed by an ordinary, skilled pharmacist must fail. *Jennings*, 2010 OK 7, ¶ 27, 230 P.3d at 86869; *Haney*, 1993 OK 41, ¶ 18, 850 P.2d at 1092.

B

The Scholls next argue that Walgreens had a duty not to abandon J.S., but the cases they cite for this proposition concern physicians, not pharmacists.[21] The Court doubts that Oklahoma would hold pharmacists, like physicians, to a duty not to abandon their patients given the marked differences in the duties owed by those two categories of professionals and the circumstances under which they provide their respective services. *Compare* Okla. Stat. tit. 59, §§ 478-518.1, *with* Okla. Stat. tit. 59, §§ 353-375.5. The fact that certain duties are owed by one group of professionals does not establish that the same duties are also owed by different, separately regulated professionals.

But even if pharmacies have a duty not to abandon their patients under Oklahoma law, Walgreens did not owe J.S. that duty based on the facts of this case. There is no evidence that J.S. was Walgreens's patient before June 13, 2020, nor is there evidence that Walgreens began providing professional services to J.S. before that date. *See* Section IV(A), *supra*. A duty not to abandon a patient only arises where the circumstances establish the existence of a physician-patient relationship because the patient has "entrusted his treatment to the physician and the physician [has] accepted the case." *Jennings*, 2010 OK 7, ¶ 18, 230 P.3d at 866-67; *see Brisco*, 2023 OK CIV APP 19, ¶¶ 14-15, 530 P.3d at 79. A jury could not find, based on the facts of this case, that those prerequisites were met with respect to J.S. before July 13, 2020. The Court

---

[21] *Sparks v. Hicks*, 1996 OK 20, ¶ 11, 912 P.2d 331, 333 (discussing a ***physician's*** duty to give reasonable notice and opportunity to secure other attention before terminating the physician-patient relationship where further medical or surgical attention is needed); *Jackson v. Oklahoma Mem'l Hosp.*, 1995 OK 112, ¶ 18, 909 P.2d 765, 774 (same).

Case No. 21-cv-363

finds no support for the suggestion that Walgreens was required to fill J.S.'s prescription before that date under an abandonment theory.

### C

The Scholls suggest that *Correa v. Schoeck* supports their assertion that Walgreens had a duty to provide the Scholls and Dr. Hildebrand with additional information regarding its policies and procedures, as well as its decision to put J.S.'s prescription on hold. 479 Mass. 686, 98 N.E.3d 191 (2018). The Court is not persuaded that the Oklahoma Supreme Court would adopt the holding in *Correa*, but even if it were to do so, the Court finds that Walgreens did not breach the duty established by the Massachusetts Supreme Court. In *Correa*, the court recognized that pharmacies owe a ***limited*** duty to notify the patient and prescribing physician when a prescription requires preauthorization. *Id.* at 698-99. The court declined, however, to require pharmacies to "follow up with the prescribing physician until they are certain that the physician received and will act upon the request for prior authorization" or "make repeated inquiries" regarding a prescription once the need for preauthorization was communicated. *Id.* at 700. And *Correa* made no mention of any purported obligation to notify a patient or medical provider of either the status of a prescription or a pharmacy's internal operating procedures. The undisputed facts of this case establish that Walgreens contacted both Dr. Hildebrand and Ms. Scholl to inform them of the need for preauthorization. *See* Dkt. 41 at 10, 11; Dkt. 46 at 8. *See also* Dkts. 41-9, 41-13. Walgreens satisfied the obligations it would owe under *Correa*. Nothing more was required of it.

### D

Finally, the Court turns to the Scholls' claim that Walgreens was generally negligent with respect to its failure to fully and accurately communicate its policies to the Scholls. *See* Dkt. 46 at 20, 23 (discussing Walgreens's failure to relay information concerning its policy to place prescriptions on hold after three attempts to obtain preauthorization, which allegedly contradicted information on Walgreens's website, and Walgreens's failure to accurately state its

Case No. 21-cv-363

policies regarding cash payments). Even if the Scholls had alleged facts in their petition to support this claim,[22] they have not pointed to any Oklahoma laws, statutes, or regulations stating that Walgreens owed a duty to disclose its internal policies to its customers—actual or potential—and the Court will not create one in the absence of that authority. If the Scholls are claiming that they were affirmatively misled by Walgreens's false statements, those claims sound in fraud, not negligence, and the Scholls have not asserted a fraud claim against Walgreens. The Court finds no basis for permitting the Scholls to pursue general negligence claims against Walgreens based on its alleged failure to accurately disclose information regarding its policies.

## V

Logic supports this Court's decision. Walgreens could not initiate the preauthorization process itself. Only Dr. Hildebrand could do that. And only Dr. Hildebrand had the information necessary to obtain the required preauthorization. The duty to obtain payment authorization from an insurer and to communicate that authorization to the pharmacy to fulfill the prescription should fall on the prescribing physician capable of obtaining and transmitting the authorization, not the pharmacy that lacks that capability.

Once Blue Cross Blue Shield authorized the prescription, the patient or prescribing physician logically had the burden to follow up and ensure that the prescription was filled. The reason for this is simple: Only the physician and the patient know whether they still need medication and, if so, how urgently it is needed. Even complicated medical issues can resolve with time; a physician may change a patient's course of treatment without notifying a pharmacy; and "[a] patient may decide at any point to take [a] prescription to a different pharmacy" or stop taking a medication altogether. *Correa*, 479

---

[22] The petition makes no reference to Walgreens's alleged failure to communicate with either the Scholls or Dr. Hildebrand regarding its internal policies, its decision to place the prescription on hold, or the fact that it had not received preauthorization for the medication as of June 16, 2020.

Case No. 21-cv-363

Mass. 700. A pharmacy is incapable of independently distinguishing whether silence on the part of a physician or patient is proof that they are awaiting information from the pharmacy, rather than proof that the medication was received, was filled elsewhere, is no longer urgently required, or is no longer needed at all. In contrast, the patient—and, in this case, the physician administering the medication—is uniquely situated to know whether medication is still required, how soon it is needed, and whether there is an ongoing expectation that a particular pharmacy will provide it. Given the superior ability of patients and physicians to assess the need and urgency for a medication, it is appropriate that patients and physicians, rather than pharmacies, bear the burden of following up to check the status of a requested medication. The pharmacy has no duty to chase down information to provide medication to a client.

The Scholls argue that Walgreens had a duty to inform them that it had closed its file and would not be filling J.S.'s prescription. But the Scholls do not provide a reasoned basis for imposing such a duty, and the Court cannot discern one. When a pharmacy advises that it lacks the information and ability to fill a prescription, it refuses the patient's request to fill the prescription. At that point, the burden shifts to the patient and physician to obtain the missing information and provide it to the pharmacy. A pharmacy need not inform the patient that it has no plans to fill a prescription, whether due to an internal policy or otherwise, when it has already stated that it cannot do so.

It may be that a duty to advise a patient of a decision not to fill a prescription could arise in certain circumstances: For example, a pharmacy that promises to fill a prescription might have a contractual duty to perform as promised; a pharmacy that represents that it will fill a prescription upon receipt of certain information might have a duty to advise the patient if it closes its file even after receiving that information. But the Court need not evaluate whether such duties exist, because those facts are not present here. The facts of this case demonstrate that Walgreens advised the Scholls and Dr.

19

Case No. 21-cv-363

Hildebrand that it needed prior authorization to fill a prescription and closed
its file when it did not receive that authorization. At that point, Walgreens's
duties with respect to the Scholls and J.S. were extinguished. Although
Walgreens allegedly received the preauthorization number after it closed its
file, there is no evidence that Walgreens agreed to fill the prescription, stated
that it would initiate a fill request, coordinated delivery, or otherwise gave any
indication that it would undertake any obligation with respect to the prescrip-
tion. Absent that evidence, the Court concludes that Walgreens had no fur-
ther duties with respect to the Scholls and J.S. until July 13, when it agreed to
fill the prescription—and did so.

## VI

The Court predicts that Oklahoma courts would hold that pharmacists
do not owe a general duty to fill prescriptions under Oklahoma law. Further-
more, there is no evidence or suggestion that Plaintiffs' injuries were caused
by Walgreens's conduct after July 13, 2020, nor is there evidence that would
permit a jury to conclude that, prior to July 13, 2020, Walgreens had a phar-
macist-client relationship with J.S. or undertook a duty to J.S. that would sup-
port a professional negligence claim. Finally, the Court concludes that
Walgreens had no legal obligation to notify the Scholls of its internal policies,
its decision to place J.S.'s prescription on hold, or the fact that it had not re-
ceived preauthorization for that prescription. In the absence of these duties,
there can be no recovery for negligence. Accordingly, Walgreens's motion for
summary judgment [Dkt. 41] is granted, and judgment is entered in favor of
Walgreens.

DATED this 28th day of March 2025.

JOHN D. RUSSELL
*United States District Judge*



# United States District Court
## for the Northern District of Oklahoma

Case No. 21-cv-363-JDR-MTS

ERIC F. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; JACQUELINE R. SCHOLL, *individually and as parent and next friend of J.J.S., a minor child*; J.J.S., *a minor child*,

*Plaintiffs,*

*versus*

WALGREENS SPECIALTY PHARMACY, LLC, *doing business as Alliance Rx Walgreens Prime*, and WALGREENS SPECIALTY PHARMACY HOLDINGS, LLC, *a foreign company*,

*Defendants.*

## JUDGMENT

Pursuant to Federal Rule of Civil Procedure 58(a), and consistent with the Opinion and Order filed contemporaneously herewith, the Court concludes that judgment in this matter should be entered in favor of Defendants Walgreens Specialty Pharmacy, LLC, and Walgreens Specialty Pharmacy Holdings, LLC.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that judgment for Defendants and against Plaintiffs is hereby entered in this matter.

DATED this 28th day of March 2025.

JOHN D. RUSSELL
*United States District Judge*